NO CV 30
FEE PAID



Melissa Fair and Zachary Smith, Pro Se Litigants
1621 W. 25th Street, #171
San Pedro, CA 90732
310-279-2000
mafair1212@gmail.com, zacharys13@gmail.com

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELISSA FAIR AND ZACHARY SMITH, | CASE NO. 2:24-cv-00378-HDV-E |
| *PLAINTIFFS*, | COMPLAINT |
| VS. | 1. VIOLATION OF CIVIL RIGHTS ACT OF 1866, 42 U.S.C. §1981 (RACE DISCRIMINATION) |
| GREGORY R. ROSEN, M.D. AND REPRODUCTIVE PARTNERS MEDICAL GROUP, INC., | 2. VIOLATION OF UNRUH CIVIL RIGHTS ACT, CAL.CIV.CODE §51.5 (RACE, COLOR AND ANCESTRY DISCRIMINATION) |
| *DEFENDANTS*. | DEMAND FOR JURY TRIAL |

"Her beautiful blue eyes and dark blonde hair and that Castilliano skin. It's magnificent."

"I have Latinos but the hair and eyes are wrong."

-Reproductive Partners Medical Group's Dr. Gregory Rosen

**NATURE OF ACTION**

1.    Plaintiffs Melissa Fair and Zachary Smith, an interracial couple, bring this action under the Civil Rights Act of 1866, 42 U.S.C. §1981, as amended, and the Unruh Civil Rights Act, California Civil Code (hereinafter C.C.C.) §51.5, to hold Dr. Gregory Rosen and Reproductive Partners Medical Group accountable for Dr. Rosen's racial and ancestry discrimination.

2.    For over a decade, Plaintiffs tried to create a family. For almost that entire time period, Plaintiffs turned to Dr. Gregory Rosen and Reproductive Partners Medical Group for assistance. Plaintiffs successfully welcomed their biologic daughter as a result of a successful I.V.F. (in vitro fertilization) procedure at Reproductive Partners in July of 2016. Plaintiffs continued their efforts to expand their family and provide a sibling for their daughter, eventually turning to the

COMPLAINT WITH JURY DEMAND - 1

possibility of donor embryo adoption to achieve a second pregnancy resulting in the live birth of a child.

3. Plaintiffs were initially unaware that Reproductive Partners had a donor embryo program because they were never advised of this by their "primary fertility doctor", Dr. Rosen. Plaintiffs ultimately became aware that donor embryo adoption existed and/or was a possible fertility option through R.P.M.G. after being advised of it in passing by another R.P.M.G. doctor. The other R.P.M.G. doctor told them that they were "good candidates" for the donor embryo program because of the extensive amount of time and money they had spent at R.P.M.G. trying to grow their family. Plaintiffs were excited about this possible option. They were told that their primary doctor, Dr. Rosen, was in fact in charge of the program.

4. From the start, Dr. Rosen was hyper-focused on the racial background of the donor parents and the need to "blend" with and "match" the family's racial makeup. Dr. Rosen repeatedly insisted that embryos be chosen that physically resembled the Plaintiffs and their daughter's physical features.

5. Melissa's mother is White and of European descent. Her father is Black. Zach's heritage is Jewish and European. Finding a "racial match" was not something that Plaintiffs prioritized in selecting donor embryos. However, Dr. Rosen was adamant, repeatedly invoking his own adopted sister (who had red hair, freckles, and pale skin) and the discomfort she experienced when people would ask about why she looked different from the rest of his family.

6. Although Plaintiffs expressed that they were open to the whole spectrum of race and were instead most concerned about having healthy children, Dr. Rosen disregarded their wishes and made race the deciding factor in embryo selection. His prioritizing race over all other characteristics and/or factors ultimately resulted in Dr. Rosen unilaterally selecting five donor embryos created two decades ago with lower likelihood of viability and/or likelihood of surviving the thaw from cryo-storage. Not only did Plaintiffs have no input in the selection of these donor embryos, these five embryos were selected in the middle of Plaintiffs' transfer cycle (which they had agreed to undergo in order to transfer two embryos from blond parents that they had previously selected and reserved, and had not agreed to release their hold on).

7. Dr. Rosen's fixation on race had devastating consequences. The donor embryos Dr. Rosen unilaterally forced upon Plaintiffs did not survive the thaw and could not be transferred. Dr. Rosen's use of race in his decision-making and insistence on curating a precise racial match *against Plaintiff's wishes* occurred during a crucial time in Plaintiff's fertility window. Dr. Rosen came dangerously close to costing Plaintiffs their last chance to expand their family through pregnancy.

8. Denying Plaintiffs access to donor embryos on the basis of race, color, and ancestry violated federal and state law.

## PARTIES

9. Plaintiffs Melissa Fair and Zachary Smith are residents of Los Angeles County.

10. Defendant Reproductive Partners Medical Group ("R.P.M.G.") is a fertility clinic with its principal place of business in this district.

11. Defendant Gregory Rosen, M.D., is a reproductive endocrinologist and employee of R.P.M.G.

## JURISDICTION AND VENUE

12. Jurisdiction is asserted under 28 U.S.C. §1343(a)(4) because this action seeks to recover damages and secure equitable relief under an act of Congress providing for the protection of civil rights.

13. Supplemental jurisdiction over state-law claims is asserted under 28 U.S.C. §1367(a).

14. The Court has personal jurisdiction over Defendants and venue is proper here under 28 U.S.C. §1391(b)(2) because the events giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

15. Plaintiffs began their efforts to create their family in 2008. After two natural pregnancies that ended in miscarriage, Plaintiffs became patients of Dr. Rosen at R.P.M.G. in 2011. Plaintiffs underwent an I.U.I. (Inter-uterine insemination) cycle and multiple I.V.F cycles/frozen embryo transfers using Melissa's eggs and Zachary's sperm.

16. In November of 2015, Plaintiffs conceived after a frozen embryo transfer, and in July of 2016, their daughter was born. Wanting to grow their family, they resumed I.V.F. and embryo transfers.

17. When their continued efforts to conceive using their own genetic material were not successful, Plaintiffs were advised they would have to consult with a marriage and family therapist in March of 2020 in order to prepare for the possibility of donor embryo adoption. Plaintiffs decided to move forward simultaneously with undergoing additional egg retrievals and reserving donor embryos. This was important to Plaintiffs because they wanted to know that they had additional options available if they were unable to successfully have another biologic child.

18. In furtherance of the embryo donation process, Dr. Rosen asked Melissa via text about the couple's ethnic backgrounds. Melissa described their backgrounds and Dr. Rosen then asked for a photograph of the couple's daughter so he could examine her "skin coloration".

19. Dr. Rosen then expressed concern that finding a donor embryo to "blend" with their child would be either very difficult or impossible. Dr. Rosen volunteered his own personal experience about his adopted sister standing out in his family because of her skin and hair color in a text from April 22, 2020.

20. By this point, Plaintiffs were becoming more and more troubled by Dr. Rosen's preoccupation with race in the donor embryo-selection process. Plaintiffs were not concerned about the race of the embryos; they simply wanted healthy embryos (of any race) that would allow them to grow their family. Plaintiffs understood, however, that Dr. Rosen was the gatekeeper to their dream of having three children, so they were hesitant to push back too firmly on his obsessive focus about the race of the embryos.

21. Melissa responded to the text above explaining that her sister's kids have very different complexions and features, and that Plaintiffs were open to embryos of any race; however, Dr. Rosen would not relent. He continued to insist on finding what he viewed as the right "blend" to

"match" the couple (and again invoked his adopted sister's skin and hair color in a text from April 8, 2020:

> *"I am very concerned that I don't have anybody in my database that would "blend" with your family. I have an adopted sister with red hair, white porcelain skin and freckles. Everybody always ask[s] where she got her hair from which everybody thought was rude and made her life difficult when she was younger. I don't want that with your child. I know your reluctance to use an egg donor. I truly respect that, but I don't have a match that I think would be a good match for your family."*

22. Melissa wrote back, explicitly notifying Dr. Rosen in writing that Plaintiffs' number one focus was on having a healthy, intelligent child, *not on a physical racial match*. This position was reiterated to Dr. Rosen during an in-person consultation Plaintiffs had with him, during which time Plaintiffs formally selected two donor embryos from blond parents to adopt from a total of five possible options Dr. Rosen presented them with.

23. Plaintiffs prepared to transfer the two donor embryos from blond parents that they had selected; however, in the middle of their transfer cycle, Dr. Rosen advised that he had unilaterally made the decision to select a set of five embryos from another couple with darker hair and complexion that he thought was a "better match".

24. Plaintiffs later learned that the five donor embryos Dr. Rosen had unilaterally selected for them were created from older technology and frozen in 1997, making them significantly likely to survive the thaw from cryo-storage and result in a successful I.V.F. transfer. The donor embryos from blond parents that Plaintiffs originally selected and reserved, on the other hand, were created and cryo-stored approximately a decade later, using newer technology, and thus were much more likely to survive the thaw from cryo-storage.

25. On July 17, 2020, Dr. Rosen documented in Plaintiffs' medical records that he rejected a set of "possible donor embryos" because *"the parents are blonde so not optimal."* Again, Dr. Rosen's unilateral rejection of these embryos occurred after Plaintiffs had formally reserved the embryos and had begun the fertility medication and transfer cycle (which they were paying for) to have the embryos transferred.

26. Dr. Rosen's rejection of the two donor embryos from blond parents was even more ironic and peculiar under the circumstances because Plaintiffs' own biologic daughter, who Dr. Rosen had received pictures of, *had dark blond hair and blue eyes*. Moreover, Plaintiffs' daughter's cousin, Melissa's sister's child, who Dr. Rosen also received pictures of, is a "tow-head blond" boy. So clearly, the idea that the donor embryo of blond parents would not be a good "match" for Plaintiffs suggests that it is not the donors' hair color *but their skin color and racial makeup* that was driving Dr. Rosen's decision about which embryos to make available to Plaintiffs'.

27. When Plaintiffs learned about the age of the five donor embryos Dr. Rosen unilaterally selected for them just prior to their transfer date, they inquired whether the age of the embryos made them any less viable. *Plaintiffs were assured by an emphatic Dr. Rosen that the five donor embryos he had selected were no less viable than embryos frozen more recently and/or no less viable than the embryos from blond parents that they had previously reserved.* Plaintiffs later learned the hard way that the information Dr. Rosen provided them with could not have been more false.

28. Preparation for embryo transfer (especially over age 45) involves several weeks of hormone treatments through a relatively brutal series of subcutaneous and intramuscular injections, patches, and/or oral medications to prepare the uterine lining to facilitate pregnancy. Common side effects of these medications including headaches, fatigue, nausea, vomiting, bloating, dizziness, weight gain, cramping, mood swings and breast pain.

29. Melissa endured terrible side effects from the hormone treatments required for I.V.F. transfer including extreme fatigue, mood alteration, and other physical symptoms.

30. Of the five embryos from the 1997 batch Dr. Rosen unilaterally selected for Plaintiffs, three did not survive the thaw. The remaining two purportedly did not grow enough to facilitate a successful transfer.

31. Nevertheless, plaintiffs both left their workplaces early the day of the transfer without having been provided with any information regarding the state of the donor embryos. When Plaintiffs arrived at the transfer location, they were ushered into a room for the transfer procedure. Melissa was given a valium to help her relax and told to undress and lie down on the

transfer table. Approximately 10 minutes later, Dr. Rosen appeared and finally advised Plaintiffs that no embryos had survived that were available to transfer.

32. When Plaintiffs asked if there was another set of donor embryos available that could be thawed for transfer that day or in the next few days (like, for example, the two donor embryos from blond parents they had previously reserved *for this transfer cycle*), Dr. Rosen refused. Plaintiffs realized that the embryos Dr. Rosen had selected for them based on his preoccupation with the donor's race had resulted in them going through the arduous process of physically and emotionally preparing for pregnancy for no reason. To add insult to injury, R.P.M.G. refused to reimburse Plaintiffs for the roughly $4000 I.V.F. transfer fee and medication-related costs.

33. Nevertheless, after returning home, Plaintiffs followed up with Dr. Rosen about next steps and were advised to call someone named Kym (whom thus far, they had never spoken to/with) regarding what donor embryos were available. Plaintiffs complied with this direction and spoke with Kym.

34. Plaintiffs were excited to learn from Kym that R.P.M.G. had tons of options available for donor embryo adoption, far more than Dr. Rosen had ever mentioned to them. Melissa followed up with Dr. Rosen that day via text regarding transferring one of the available options as soon as possible, possibly even this same cycle. Dr. Rosen responded to Melissa's text inquiry stating: 1) She could not do a transfer immediately with different embryos (i.e. - she would need to wait and do another painful and expensive cycle of medication and complications); and 2) he, alone, was responsible for approving which embryos they could have transferred to Melissa.

35. Ultimately, on June 21, 2021, Melissa received a text from Dr. Rosen stating, "With regard to donated embryos, Kym was going to call you, if she hasn't already, and tell you that we have nothing that fits your needs at this time and she was going to suggest to you that you try back in 4 to 6 months and see if we have any new embryos". In other words, R.P.M.G. did not have any embryos Dr. Rosen believed fit the racial profile for Plaintiff's mixed-race family despite the fact that they had a great deal of donor embryos Plaintiffs were actually interested in adopting. Plaintiffs understood the meaning of this text loud and clear: after thwarting all their

efforts thus far to adopt the donor embryos they had actually selected and only allowing them to potentially transfer five unviable embryos, R.P.M.G. was denying them service.

## CLAIM 1: 42 U.S.C. 1981

## RACE DISCRIMINATION IN CONTRACTING

36. Plaintiffs incorporate all allegations of this complaint.

37. As detailed above, Defendants violated Plaintiffs' rights to equal treatment in making and enforcing contracts including enjoying all benefits, privileges, terms, and conditions of the contractual relationship under the Civil Rights Act of 1866, 42 U.S.C. §1981(a) and §1981(b), as amended in 1991.

38. 42 U.S.C. §1981 provides:

(a) Statement of Equal Rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined: For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.

(c) Protection against impairment: The rights protected by this section are protected against impairment.

39. Dr. Rosen, as documented in text communications and medical records and confirmed in in person consultations, denied Plaintiffs access to donor embryos available for adoption on the basis of Plaintiff's races, treating them differently than the "White citizens" who were also clients of Defendants.

40. It is a "Fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary, contemporary, common meaning at the time Congress

enacted the statute." *Wisconsin Cent., Ltd. v. United States*, 138 S. Ct. 2067, 2074, 201 L. Ed. 2d 490 (2018) (citation omitted). See also Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 69-77 (2012).

41. In 1866, "White citizen" as used in the text of 1981 meant "White Protestant" and excluded all other groups including the children of interracial couples and people of Jewish heritage.

42. Neither Plaintiff would have been considered a "White citizen" in 1866.

43. As a result of Dr. Rosen's discriminatory limitations on Plaintiffs' options for donor embryos in comparison with "White" couples, Plaintiffs were unable to expand their family and continue to be emotionally injured by Defendants' discriminatory practices against them as "Non-white" within the meaning of §1981. Had Defendants offered Plaintiffs the same choices offered to "White citizens", Plaintiffs' injuries would have been avoided.

44. But for Plaintiffs' races, they would not have experienced the disparate treatment to which Defendants subjected them.

45. Defendants adopted standards for donor embryo adoption selection that were racially motivated and discriminatory.

46. Against their will, Plaintiffs had to devote time and energy to navigating Dr. Rosen's efforts to racially curate their family. This was fundamentally unfair and caused Melissa mental anguish and physical distress.

47. Moreover, the delay that occurred as a result of Dr. Rosen's efforts to racially curate their family - in addition to Dr. Rosen's selecting for Plaintiffs much older and lower-quality embryos on the basis of race against Plaintiffs' expressed wishes - cost Plaintiffs valuable time in their limited fertility window and almost permanently ended Plaintiffs' chances of expanding their family through pregnancy.

48. As a direct and proximate result of Defendants' illegal, intentional and persistent race discrimination against Plaintiffs, Plaintiffs have suffered and continue to suffer substantial damages.

49. Defendants' acts were intentional, malicious, and demonstrate reckless indifference to Plaintiffs' rights.

### CLAIM 2: CALIFORNIA CIVIL CODE §51.5
### RACE, COLOR, AND ANCESTRY DISCRIMINATION

50. Plaintiffs incorporate all allegations of this complaint.

51. Defendants denied Plaintiffs full and equal services on the basis of race, color and ancestry.

52. C.C.C. §51(b) provides in relevant part:

> All persons within the jurisdiction of this state are free and equal, and no matter what their…race, color, [or] … ancestry, … are entitled to the full and equal accommodations, advantages, facilities, privileges, and services in all business establishments of every kind whatsoever. (Emphases added).

53. C.C.C.§ 51.5(a) provides in relevant part:

> No business establishment of any kind whatsoever shall discriminate against… any person in this state on account of any characteristic listed or defined in subdivision (b)... of §51.

54. Dr. Rosen, as documented in text communications and medical records and confirmed in in person consultations, denied Plaintiffs access to donor embryos on the basis of Plaintiffs' races, colors, and ancestries, thus denying them full and equal accommodations, advantages, privileges, and services in comparison with white clients and other couples.

55. Dr. Rosen's obsession with Plaintiffs' race, color, and ancestry, as well as the race, color, and ancestry of their biologic daughter, denied Plaintiffs access to donor embryos for adoption on the basis of Plaintiffs' races, colors, and ancestries. Defendants made different embryos available the Plaintiffs than they would have if Plaintiffs were white.

56. As a result of Dr. Rosen's discriminatory limitations on Plaintiffs' options for donor embryos based on race, color, and ancestry, Plaintiffs were unable to expand their family and continue to be emotionally injured by Defendants' discriminatory practices against them. Had Defendants offered to Plaintiffs full and equal accommodations, advantages, privilege, and

services offered to white clients and/or white couples Plaintiffs' injuries would have been avoided.

57. But for Plaintiffs' races, colors, and ancestries, they would not have experienced the disparate treatment Defendants subjected them to.

58. Defendants adopted standards for donor embryo adoption that were motivated by race, color, and ancestry. Such policies and standards were discriminatory.

59. Against their will, Plaintiffs had to devote time and energy to navigating Dr. Rosen's efforts to curate their family on the basis of race, color, and ancestry. This was fundamentally unfair and caused Melissa serious mental anguish and physical distress.

60. Moreover, the delay that occurred as a result of Dr. Rosen's efforts to racially curate their family, in addition to Dr. Rosen's selecting for Plaintiffs much older and lower-quality embryos on the basis of race, against Plaintiffs' expressed wishes, cost Plaintiffs valuable time in their limited fertility window and almost permanently ended Plaintiffs' chances of expanding their family through pregnancy.

61. As a direct and proximate result of Defendants' illegal, intentional, and persistent race, color, and ancestry discrimination against Plaintiffs within the meaning of C.C.C. §51(b) and §51.5(a), Plaintiffs have suffered and continue to suffer substantial damages.

62. Defendants' acts were intentional, malicious, and demonstrate reckless indifference to the Plaintiffs' rights.

## PRAYER FOR RELIEF

Plaintiffs respectfully request the following relief:

- Declare that Defendants' acts and conduct violate federal and state law;
- Enter judgment in Plaintiffs' favor;
- Award Plaintiffs full compensatory damages, economic and non-economic including, but not limited to, damages for pain, suffering, mental anguish, emotional distress, humiliation, and inconvenience that Melissa has suffered and is reasonably certain to suffer in the future;
- Award punitive damages;

- Award Plaintiffs their reasonable attorneys' fees and all other costs of this suit under 42 U.S.C. §1988 and California Civil Code §52(a);
- Award pre- and post-judgment interest at the highest lawful rate;
- Award all other relief in law or equity to which Plaintiffs are entitled and that the Court deems equitable, just, or proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues within this complaint.

DATED:  January 12, 2024.                    Respectfully submitted,



Melissa Fair and Zachary Smith
Pro Se Litigants (and attorneys)
1621 W. 25th Street, #171
San Pedro, CA 90732
310-279-2000; 310-621-8890
mafair1212@gmail.com; zacharys13@gmail.com